IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Pennswood Manor Real Estate         :
Associates, LLC,                     :
              Appellant             :
                                        :
          v.                         :
                                        :
Zoning Hearing Board of the       :     No. 896 C.D. 2014
City of Scranton                 :     Argued: March 9, 2015

BEFORE:     HONORABLE BERNARD L. McGINLEY, Judge
                  HONORABLE PATRICIA A. McCULLOUGH, Judge
                  HONORABLE JAMES GARDNER COLINS, Senior Judge

OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE McGINLEY                     FILED: September 24, 2015

Pennswood Manor Real Estate Associates, LLC (Pennswood) appeals the order of the Court of Common Pleas of Lackawanna County (common pleas court) that affirmed the denial by the City of Scranton Zoning Hearing Board (Board) of Pennswood's request for a variance to allow its tenant, Cedar Residence, Inc. (Cedar) to operate a Treatment Center/Step Down Unit at 929 Cedar Avenue, Scranton, Pennsylvania (the Property).

The Property is located in an R-2 zone-medium density residential district.[1] Under the City of Scranton Zoning Ordinance (Ordinance), neither a personal care home nor a treatment center is a permitted use in an R-2 district.

---

[1] The following uses are permitted in an R-2 district: crop farming; single family detached dwelling; single family semi-detached dwelling; townhouse; group home within a lawful dwelling unit; golf course; plant nursery restricted to sale of items; community center or public library; place of worship; school; city-owned uses for a valid governmental, recycling, public health, public safety, recreation, stormwater or public utility purpose; emergency services

**(Footnote continued on next page…)**

On March 1, 2013, Pennswood applied[2] for a variance to operate a "Treatment Center/Step Down Unit" at the Property. Application for Variance, March 1, 2013, (Application) at 1; Reproduced Record (R.R.) at RR15. A treatment center is not a permitted use in the R-2 District. Pennswood believed that it was entitled to a variance at the Property, which was originally an elementary/middle school. Pennswood explained that in 1986, the Board granted a variance for the operation of a personal care home at the Property. In its justification for the variance, Pennswood explained its current use of the Property:

> The property presently is owned by Pennswood who [sic] leases <u>one floor and basement</u> of the three-story stone and brick building to . . . Cedar Residence, Inc. ('Cedar') for the operation of a 'step down unit', a voluntary, transitional, residential, non-medication, drug free, non-hospital, in patient center for males over 18 years of age, who recently and successfully underwent substance abuse treatment and counseling at facilities such as Marworth Alcohol Treatment, Clearbrook Treatment Center, and Choices, to name but a few. A resident's length of stay is for a 30 to 90 day time period. While at Cedar, a resident receives counseling and training in life skills so as to encourage reintegration into the community, to foster employment and to build self-reliance, all designed to shape that person into a productive, responsible and sober member of society.

---

**(continued...)**

station; nature preserve; non-profit; publicly-owned recreation; U.S. Postal Service facility; surface parking; day care center in a place of worship; home occupation, light; and unit for care of relative.

[2] This Court notes that though Pennswood applied for a variance to allow Cedar to operate a treatment or "step down" facility on the Property, the treatment facility was already in operation.

> Cedar is licensed to operate 25 beds, and recently, upon learning of an opportunity to increase its service capacity, filed an application to increase its licensed bed allotment to 40. . . . (Citation omitted. Emphasis in original.)

Application at 4; R.R. at RR20.

In the Application, Pennswood explained that it was entitled to a variance:

> As to Pennswood's present lease of one floor and basement of the property to Cedar for its operation of a residential step down unit, Pennswood's use of its property is prohibited by the Zoning Ordinance and such a prohibition creates an unnecessary hardship on Pennswood in that compliance with the Zoning Ordinance would render the property practically useless.
> . . . .
> Absent the ZHB's [Board] grant of Pennswood's Application which would allow Pennswood to lease one floor and basement of the property to Cedar for its operation of a residential step down unit as so described herein, the property would be rendered almost valueless due to the restriction on the types of uses allowed by the Zoning Ordinance in an R-2 Zone. . . .
>
> Here, the physical characteristics of the property limits its use to that of either a personal care home in the case of Pennswood Manor or a residential step down unit in the case of Cedar; after all, the building was designed to be used as a school and not for the residential purposes so permitted in an R-2 Zone. The costs associated with converting the building into a permitted purpose as found in an R-2 Zone would be prohibitive. As such, the building would have no value or only distress value for any use approved by the Zoning Ordinance. . . . There is no possibility that the property can be developed in conformity with the Zoning Ordinance. . . . The property is subject to hardship, and the hardship is not self-inflicted. (Citations omitted.)

Application at 9-10; R.R. at RR 25-RR26.

3

Pennswood reported that in 2011, Cedar appealed a notice of violation letter issued by the Zoning Code Enforcement Officer, Michael Wallace, that addressed the conversion of the Property from a personal care home to a treatment center. Cedar also applied for a variance. Following a hearing, the Board denied the appeal of the notice of violation and denied the requested variance. Cedar appealed to the common pleas court which dismissed the appeal because Cedar's counsel failed to appear for the scheduled oral argument.

On June 12, 2013, the Board conducted a hearing on Pennswood's variance application. Dave Rabbico (Rabbico), a licensed real estate broker, testified on behalf of Pennswood that he inspected and toured the Property and found that the building was well maintained and very clean, though it had "seen better days." Notes of Testimony, June 12, 2013, (N.T.) at 11-12; R.R. at RR51. Concerning the effect of the Property on the immediate neighborhood, Rabbico testified, "From my observation and opinion, it has a very positive effect. It's, like I said, the outside is very presentable. It seems like more of a cornerstone. There is a vacant business next to it but I think it's a cornerstone of the area." N.T. at 12-13; R.R. at RR51. Rabbico also testified that if the variance was denied, then it would not be feasible to renovate the Property for residential use as an upscale project because of the cost, the lack of parking, and the fact that that area was "more commercial than residential." N.T. at 14-15; R.R. at RR51-RR52. He did not believe that the Property was suitable for single or multi-family housing as permitted in the R-2 district. He believed that the grant of the variance would maintain the status quo in the neighborhood. N.T. at 15-16; R.R. at RR52. Rabbico did not think that the proposed use of the Property would have a negative

effect on South Scranton Intermediate School which was located nearby on Maple Street.  N.T. at 22; R.R. at RR53.

Robert Hughes (Hughes), a representative of Pennswood, was called as a witness and stated that he testified previously at the 2011 variance hearing. N.T. at 29; R.R. at RR55.  When asked by Pennswood's counsel whether he stood by that testimony, Hughes replied, "Yes, I do."  N.T. at 30; R.R. at RR55.  At that point Pennswood's counsel, Christopher P. Cullen (Attorney Cullen) moved the transcript from the 2011 hearing into the record.[3]

---

[3]  At the time of the 2011 hearing, Hughes was a planning and development consultant who specialized in regulatory compliance regarding personal care homes and inpatient non-medication facilities.  Hughes testified that Cedar's treatment center was less intrusive than a personal care home:

> The Cedar Residence is a . . . significantly less intrusive environment.  An individual can be admitted to a personal care home who has a serious criminal conviction because a personal care home cannot do a criminal background check on residents before they're admitted.  So you can admit somebody who has a major capitol [sic] offense on their [sic] record.  You can admit people who are being discharged from active substance abuse programs.  Personal care home doesn't [sic] have to adhere to the very strict guidelines set up by the Pennsylvania Department of Health for a step down unit such as Cedar Residence.

Notes of Testimony, September 14, 2011, (N.T. 9/14/11) at 52; R.R. at RR144.

Hughes further testified that the residents at Cedar were not permitted to have alcohol either on or off the property or to participate in the use of narcotics or other drugs.  N.T. 9/14/11 at 55; R.R. at RR147.  Hughes likened Cedar to a halfway house though the residents had not been ordered by a court to stay there.  N.T. 9/14/11 at 57; R.R. at RR149.  Hughes testified that Cedar was entitled to a variance:

> Because of the mutation and definitions.  And what the definition for personal care and for an inpatient non-hospital center is, there has been a barring [sic] of lies [sic].  And we believe it strongly

**(Footnote continued on next page…)**

The operator of the personal care home that previously was located at the Property could not continue to operate at that location because it cost approximately $1,500 per month per resident and the reimbursement from the Commonwealth of Pennsylvania per month per resident was "only a little over a $1,000 per month." N.T. at 31; R.R. at RR56. Hughes explained that the reimbursement rate at a step-down facility was close to $3,000 per month and the individual residents were younger and were more likely to require counseling services than physical care services. N.T. at 32-33; R.R. at RR56. Hughes admitted that someone possibly could operate a personal care home at the Property:

> [B]ut they would have to be able to come in and be able to attract private paid residents at a much higher rate than the state supplement and studies have indicated that it's unlikely that individuals with assets who can afford to move in to a care center in suburbs would be willing to move into South Scranton when they have other options that are available to them.

N.T. at 34; R.R. at RR56.

Thomas Lavelle (Lavelle), facility director for Cedar, testified that residents receive counseling on drug and alcohol issues as well as life skills. N.T.

---

**(continued…)**

> that the variance would be a proper methodology because the current zoning definitions don't match up with the current definitions in the Commonwealth of Pennsylvania, so there's becoming a blurring there. And it seems to me and seems to others that there's an overlapping of what's defined in a personal care home and what's allowed in a personal care home and what's allowed with this type of center.

N.T. 9/14/11 at 62-63; R.R. at RR154 – RR155.

at 40; R.R. at RR58. Lavelle testified that the doors of the facility were locked by eleven p.m. The facility issued passes when a resident wanted to leave the facility. N.T. at 42; R.R. at RR59.

Paul Ludovici (Ludovici), a self-employed contractor who had performed renovations, repairs, and roofing at the Property over approximately eight years, testified that the Property was in good condition and submitted a letter of support for the variance which was signed by neighbors of the Property. N.T. at 53-55; R.R. at RR61-RR62.

James Talarico, a property owner across the street from the Property, who signed the letter circulated by Ludovici, testified that he supported the grant of the variance and stated that the Property was well maintained and he had not observed any problems. N.T. at 56-58; R.R. at RR62.

Vince Martino, a certified construction manager and principal owner of BCM Construction Management, testified that it would cost Pennswood between $3.5 million and $4.1 million to convert the Property to residential use and that it would cost $40,000 per year to pay back a $3 million fifteen year loan. N.T. at 62; R.R. at RR63.

William King (King), the superintendent of the Scranton School District, testified in opposition to the variance:

> My concern as many of you had discussed earlier is that
> the location of this facility would be a half a block from
> South Scranton Intermediate School in close proximity to

7

> a bus stop where children would be boarding a bus, young children. The children that attend South Scranton Intermediate School are grades six through eight which are ages typically 11 to 14. I do have some concerns about the fact that it's not a lock down facility in that the residents can come and go as they please. Recently I was involved with a cleanup project in South Scranton. My daughter is a member of the student council at South and one Saturday morning we did a cleanup of that whole area. As I was cleaning along with my daughter I did find a hyperdermic [sic] needle, not on the facility grounds, approximately I would say 60 to 70 meters in the back alley from the Pennswood Manor facility.

N.T. at 68-69; R.R. at RR65.

King also stated that he had an incident analysis report which indicated that the police had been called to the Property thirteen times since January 6, 2012, for various reasons including drunkenness, disorderly conduct, theft, and trespass. N.T. at 69; R.R. at RR65. He also referred to a report from the Pennsylvania Department of Health which indicated there were 102 deficiencies at the Property where the average for other facilities was thirty. N.T. at 72-73; R.R. at RR66. King testified that the use of the Property as a treatment center would alter the essential character of the neighborhood. N.T. at 74; R.R. at RR66.

Andrea Wharton (Wharton), the president of the South Side Neighborhood Watch, testified that she previously voiced her concerns about the treatment center but was told by Pennswood's counsel that if she persisted, Pennswood would pursue her for any harm caused. N.T. at 108; R.R. at RR75. Wharton testified that the facility has never been in compliance with the regulation of the Pennsylvania Department of Health. N.T. at 108-110; R.R. at RR75. Wharton stated without objection that her daughter who attended the nearby school

8

reported that men outside the Property would ask children if they "had lighters or matches." N.T. at 112; R.R. at RR76.

Gail Craven, a neighboring property owner, spoke in opposition to the variance because "it's greatly impacted our neighborhood not to the good. I'm concerned about my property values. I know we have the on street restoration in swing. I don't think that helps this project in South Scranton at all." N.T. at 115; R.R. at RR77.

Rosemary Ferrise, another resident of the neighborhood, did not want the treatment center in the neighborhood because she was concerned with safety. N.T. at 118; R.R. at RR77.

Michael Caswell (Caswell), a resident in the neighborhood, testified in opposition to the variance because "our [property] values would go down." N.T. at 119; R.R. at RR78. Caswell also testified "we've been there for years, people have been there for years, they like their neighborhood, they don't need this type of a business there. They are afraid." N.T. at 120; R.R. at RR78.

Christina Turnbull, a resident of South Scranton and a teacher at South Scranton Intermediate School, testified:

> My concerns are many with regards to this rehab facility being placed or . . . currently running in a residential neighborhood. As I [sic] teacher it concerns me that my students have to walk by this facility everyday [sic]. Some students may not be aware of what this facility is, others are however. Were you also aware that this was a bus stop for McNichols Elementary students[?]

9

> Everyday [sic] I drive past and amongst smiling children there are patients sitting outside smoking cigarettes. What message are we sending to our city's impressible [sic] children. . . .

N.T. at 121-122; R.R. at RR78.

Steve Wallace, vice president and commander of the South Side Neighborhood Watch, opposed the variance and testified that Pennswood's counsel threatened to sue residents for defamation if they spoke out regarding the variance. N.T. at 124-125; R.R. at RR79.

The Board denied the request for a variance on the basis that the proposed variance would alter the essential character of the neighborhood and would not represent the minimum variance that would afford relief.

Pennswood appealed to the common pleas court which affirmed after the submission of briefs and oral argument. The common pleas court reasoned:

> Firstly, the law of Pennsylvania is clear that a zoning board need only grant a variance when **all** the factors of 53 Pa. Stat. Ann. [sic] §10910.2 [Pennsylvania Municipalities Planning Code (MPC), Act of July 31, 1968, P.L. 805, as amended, 53 P.S. § 10910.2. This section was added by the Act of December 21, 1988, P.L. 1329.] apply. One such required finding in such a matter is that the 'unnecessary hardship' cited by the party seeking the variance, was not caused by the same party. In the case at hand, the hardship was created by the party seeking the variance, and therefore the variance cannot be granted. PMR [Pennswood] sought this variance only after permitting Cedar House to function and rent at their [sic] location in an R-2 Zone, and before seeking a variance, a variance that would clearly be required for such a treatment center to function at PMR's

10

[Pennswood] property in question. Thus, the economic hardship that PMR [Pennswood] would suffer by the ZB's [Board] decision being enforced is of their [sic] own creation. If PMR [Pennswood] had sought a variance prior to allowing Cedar House to rent at the location, there would be no hardship to them [sic], since either such would have been granted or such would not have been permitted, and PMR [Pennswood] then could have sought another rentor [sic] whose use of the residence would have been permissible under the Scranton Zoning Ordinances. Furthermore, if PMR [Pennswood] had originally not rented to Cedar House, but had instead found a rentor [sic] whose use of the property would fit within the parameters of the applicable zoning ordinances, there would be no potential hardship suffered by PMR [Pennswood]. Thus, it is clearly the fault of the moving party for the variance, PMR [Pennswood] that they [sic] will suffer a hardship if the variance is not granted.

In addition, an economic hardship alone is not enough to grant a zoning ordinance [sic], and that is purely the core of the argument PMR [Pennswood] presented to this court. To not allow Cedar House to function at this location. . . PMR [Pennswood] would suffer an economic hardship. However, such is solely the fault of PMR [Pennswood] for not properly seeking the required variance prior to renting to Cedar House, and an economic hardship alone is not enough for this court to go against the laws and ordinances clearly adverse to such a variance being granted.

Also, under the zoning Ordinances of the City of Scranton, an R-2 Zone, which the property in question is located in, does not permit a Treatment Center to function there, without a variance. A Treatment Center, as defined by Scranton's Zoning Ordinance clearly falls in line with the functions of PMR's [Pennswood] rentor [sic], Cedar House. Cedar House provides specialized housing and counseling to individuals for a non-permanent period of time after they have gone to extended drug and/or alcohol treatment programs. The functions of Cedar House fall clearly and directly in line

11

with the definition under Scranton Zoning Ordinances for what they deem a Treatment Center to be, and such is not permitted in the zone for which PMR's [Pennswood] property exists without a variance, which as discussed above, PMR [Pennswood] is not entitled to said variance.

Thus, in consideration of the aforementioned laws, ordinances, and reasoning this court, in its appropriate scope of review in such a matter, finds that the Appellant [Pennswood] did not meet their [sic] burden in this matter, and therefore did not show that the Appellee [Board] manifestly abused its discretion or committed an error of law in not granting the Appellant's [Pennswood] Application for Relief through Variance. . . .

Therefore, this court finds that the granting of the variance, as requested by the Appellant [Pennswood] would have sufficiently altered the essential character of the neighborhood and the Appellee [Board] did apply the appropriate and applicable standards set forth in Pennsylvania Law and the City of Scranton Zoning Ordinances in denying the Appellant's [Pennswood] application for Relief through Variance without any manifest abuse of discretion or error of law by the Appellee [Board]. (Citations omitted. Emphasis in original.)

Common Pleas Court Opinion, August 22, 2014, at 4-6.

Pennswood argues that the Board's claim of a self-created hardship on the part of Pennswood was first raised before the common pleas court and was not in the Board's findings of fact and conclusions of law. Pennswood also asserts that the Board's role as factfinder and neutral arbitrator was compromised due to bias and prejudice expressed on the record by the Board.[4]

---

[4] In an appeal from the grant or denial of a zoning variance where, as here, the common pleas court has not taken any additional evidence, this Court's scope of review is limited to a determination of whether the Zoning Hearing Board committed an error of law or **(Footnote continued on next page…)**

12

Pennswood is correct that self-created hardship was not mentioned in the Board's decision.[5]  However, in order to obtain a variance, it was Pennswood's burden to prove that the City of Scranton Zoning Ordinance (Ordinance) created an unnecessary hardship upon its use of the Property.

Pennsylvania law requires that the party seeking a variance establish that the applicable zoning ordinance creates an unnecessary hardship upon the applicant.  Section 910.2(a) of the MPC provides:

> (a) The board shall hear requests for variances where it is alleged that the provisions of the zoning ordinance inflict unnecessary hardship upon the applicant.  The board may by rule prescribe the form of application and may require preliminary application to the zoning officer.  The board may grant a variance provided that all of the following findings are made where relevant in a given case:
>
> 1) there are unique physical circumstances or conditions, including irregularity, narrowness, or shallowness of lot size or shape, or exceptional topographical or other physical conditions  peculiar to the particular property and that the unnecessary hardship  is due to such conditions and not the circumstances or conditions  generally created by the provisions of the zoning ordinance in the  neighborhood or district in which the property is located;
>
> 2) because of such physical circumstances or conditions,

**(continued…)**

abused its discretion.  Great Valley School District v. Zoning Hearing Board of East Whiteland Township, 863 A.2d 74 n.1 (Pa. Cmwlth. 2004).  An abuse of discretion will only be found where the Zoning Board's findings are not supported by substantial evidence – i.e., relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Id.

[5]  This Court has foregone the sequence of Pennswood's arguments.

13

there is no possibility that the property can be developed in strict conformity with the provisions of the zoning ordinance and that the authorization of a variance is therefore necessary to enable the reasonable use of the property;

3) such unnecessary hardship has not been created by the appellant;

4) the variance, if authorized, will not alter the essential character of the neighborhood or district in which the property is located, nor substantially or permanently impair the appropriate use or development of adjacent property, nor be detrimental to the public welfare; and

5) the variance, if authorized, will represent the minimum variance that will afford relief and will represent the least modification possible of the regulation in issue.

53 P.S. § 10910.2(a) (emphasis added).

Further, Section 111.E.3.c. of the Ordinance provides:

Additional standards.

i) Mere showing of economic hardship, shall not by itself justify a zoning variance.

ii) A variance may be granted where the applicant proves that the property can only be used for a permitted use at prohibitive expense.

iii) A variance may be granted where clearly necessary to comply with the Federal Americans with Disabilities Act.

Therefore, Pennswood had the burden to prove that it met all of the requirements for a variance. Pennswood did present testimony regarding the

14

difficulty of using the Property in conformity with the permitted uses in an R-2 district because the building on the Property was originally a school. However, it is not clear whether Pennswood explored any other options. Further, a personal care home operated at the Property pursuant to an earlier variance. The prior tenant could not continue to operate due to the lower reimbursement rate from the State of Pennsylvania, according to Hughes. However, it is unclear from the record whether Pennswood sought another personal care home to operate at the Property. Hughes testified that the operation of a step down facility was more profitable. The Ordinance provides that a mere showing of economic hardship is not sufficient justification for the grant of a variance. The only hardship Pennswood established was economic.

"One applying for a variance must demonstrate that the zoning regulations complained of uniquely burden his property; and mere economic hardship resulting from the necessity for complying with the regulations shared in common with all other landowners is not unnecessary hardship." Kar Kingdom, Inc. v. Zoning Hearing Board of Middletown Township, 489 A.2d 972 (Pa.Cmwlth. 1985) (citing Appeal of Buckingham Developers, Inc., 433 A.2d 931, 933 (Pa.Cmwlth. 1981)). Under the MPC, the standard requires that the hardship be imposed by the unique physical circumstances or conditions of the property, not the circumstances or conditions created by the provisions of the zoning ordinance. Section 910.2(a)(1) of the MPC, 53 P.S. § 10910.2(a)(1). Further, there must be no possibility that the property may be developed in strict compliance with the provisions of the zoning ordinance. Section 910.2(a)(1) of the MPC, 53 P.S. § 10910.2(a)(2).

15

This Court agrees with the common pleas court that Pennswood failed to establish an unnecessary hardship based on the physical circumstances of the Property and alleged a hardship solely on economic grounds. This Court also agrees with the common pleas court that Pennswood exacerbated any economic hardship when it chose to lease to Cedar even though it was clear that the use of the Property by Cedar was not in conformity with the Ordinance.

Pennswood next contends that the Board's role as factfinder and neutral arbiter was compromised because the Board, specifically one of its members, Ms. Wardell, made an injudicious statement regarding the facility which emboldened the "tone, and content" of the objectors' subjective statements which led the Board to disregard the evidence presented by Pennswood.

Ms. Wardell commented that while step-down facilities were necessary, she did not believe that they belonged in a residential area. N.T. at 24; R.R. at RR54. While this comment might have been imprudent, Pennswood's argument is speculative and it is not clear from the record that this statement constituted bias such that the Board abused its discretion. Additionally, there is nothing to indicate that Ms. Wardell's statement emboldened the objectors.[6]

---

[6] Pennswood also contends that the Board's findings that the grant of the requested variance would alter the essential character of the Property's immediate neighborhood and would not represent the minimum variance to afford relief were unsupported by substantial evidence and constituted an abuse of discretion; and that the Board erred when it overruled Pennswood's objections to the admission of the incident analysis report from the Scranton Police Department and the report from the Pennsylvania Department of Health which indicated the deficiencies at the facility. Because this Court has determined that Pennswood failed to prove that there was an unnecessary hardship which required a variance, the Court need not address these issues. Finally, Pennswood argues that the grant of the variance was clearly necessary to comply with **(Footnote continued on next page…)**

16

Accordingly, this Court affirms.

_____
BERNARD L. McGINLEY, Judge

Judge McCullough dissents and wishes merely to be so noted.

_____

**(continued…)**

the Americans with Disabilities Act, 42 U.S.C. §§12101-12213. A review of the record reveals that Pennswood did not raise this issue before either the Board or the common pleas court. Pa. R.A.P. 302(a) provides that "[i]ssues not raised in the lower court are waived and cannot be raised for the first time on appeal." Therefore, this Court will not address this issue.

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Pennswood Manor Real Estate
Associates, LLC,
          Appellant

        v.

Zoning Hearing Board of the
City of Scranton

:
:
:
:
:
:
:
:
:   No. 896 C.D. 2014
:

## **O R D E R**

AND NOW, this 24th day of September, 2015, the order of the Court of Common Pleas of Lackawanna County in the above-captioned matter is affirmed.

_____
BERNARD L. McGINLEY, Judge